Kaufman v Kaufman (2020 NY Slip Op 05732)





Kaufman v Kaufman


2020 NY Slip Op 05732


Decided on October 14, 2020


Appellate Division, Second Department


Scheinkman, P.J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on October 14, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

ALAN D. SCHEINKMAN, P.J.
JOSEPH J. MALTESE
HECTOR D. LASALLE
LINDA CHRISTOPHER, JJ.


2016-02329 OPINION & ORDER
2016-07969
 (Index No. 4893/11)

[*1]Kim A. Kaufman, respondent-appellant, 
v
Glenn B. Kaufman, appellant-respondent.



APPEAL by the defendant, in an action for a divorce and ancillary relief, from (1) an order of the Supreme Court (Lawrence H. Ecker, J.), dated February 29, 2016, and entered in Westchester County, and (2) a judgment of the same court dated July 21, 2016, and CROSS APPEAL by the plaintiff from the judgment. The order, insofar as appealed from, inter alia, awarded the plaintiff $1.5 million in counsel fees. The judgment, insofar as appealed from, upon, among other things, a decision of the same court dated August 11, 2014, made after a nonjury trial, and the order, inter alia, equitably distributed the parties' assets and awarded the plaintiff $1.5 million in interim counsel fees. The judgment, insofar as cross-appealed from, among other things, equitably distributed the parties' assets, calculated the defendant's child support obligation, and failed to direct the defendant to maintain a life insurance policy for the benefit of the parties' children until the emancipation of the parties' youngest child.



Cohen Clair Lans Greifer Thorpe & Rottenstreich LLP, New York, NY (Dan Rottenstreich, John O. Farley, and Pollack Pollack Isaac & DeCicco, LLP [Paul H. Seidenstock and Brian J. Isaac], of counsel), for appellant-respondent.
Kramer Kozek, LLP, White Plains, NY (Deborah Sherman and Elliott Scheinberg of counsel), for respondent-appellant.



SCHEINKMAN, P.J.


DECISION & ORDER
These appeals and cross appeal, as well as the two other appeals in the same case also decided today, are a graphic illustration of the prolixity that may ensue when a complicated matrimonial case is cabined into constituent parts which are heard and decided piecemeal by the Supreme Court. The court bifurcated the trial into phases but, in the end, only conducted one of the two promised phases of the trial. Because some of the issues did not lend themselves to a neat division, the issues, and the court's seriatim determination of them, overlap. As a consequence of the incremental approach to the serial determination of the significant issues raised, which were followed by sequential appeals and cross appeals from the various orders and the final judgment, which appeals are prosecuted on voluminous appendices and supplemental appendices, this Court has not been provided with either a clear, comprehensible, and accessible record or a unified, comprehensive analysis by each party as to what determinations were made by the Supreme Court and which of those decisions each party accepts or challenges. Moreover, with respect to equitable distribution of the parties' substantial investment assets, the judgment of divorce entered by the court merely incorporated by reference its prior decisions, without specifying what is actually ordered, adjudged, and decreed, except that it set forth certain deviations from those prior decisions. Since the decisions conflict with each other in important respects, it is unclear what the court actually directed as to the equitable distribution of major and valuable assets.
Most significantly, while the Supreme Court initially divided the trial into phases, it ultimately conducted only the first phase of the trial and rendered one posttrial decision; the other phase of the trial was short-circuited, with decisions being rendered on the basis of the record in the first trial, supplemented by what the court gleaned from conferences and from motion practice. The court's failure to conduct a trial on all contested issues, in contravention of the court's own established ground rules for this case, is a fundamental error that would ordinarily, by itself, require reversal of those aspects of the court's determinations which are contested by the parties and were made without affording them the opportunity to submit their evidence. However, on those issues where the parties seek review but do not request a further hearing, we have evaluated their positions on the basis of the record as it stands.
We take this opportunity to remind the matrimonial courts of their fundamental obligations to conduct a trial on the contested financial issues, to develop a clear trial record, to render a comprehensive decision which covers all of the issues in dispute, and to issue a comprehensive judgment which clearly and definitively sets forth the parties' rights and obligations. While it is within the discretion of the courts to bifurcate the financial issues to be tried, the courts should refrain from issuing piecemeal decisions. The issues of equitable distribution, maintenance, child support, and counsel fees are intertwined. Indeed, equitable distribution sub-issues such as the characterization, value, and distribution percentage of the parties' property are also interconnected. A holistic and comprehensive review of the parties' finances is required in order to provide a just and equitable resolution of the parties' rights and obligations. Moreover, it should not be necessary to emphasize, as we do here, that the court's decision after trial should be based on the evidence admitted at the trial and the parties should have a full and fair opportunity to tender admissible evidence relevant to all of the issues in dispute.
I. The Relevant Facts
A. Background
The parties were married in 2000, and have two children, born in 2002 and 2003. The Supreme Court in some, but not all, of its decisions below referred to the parties by initials only due to unspecified "privacy" concerns. Since no motion was made or granted to provide for an anonymous caption, we refer to the parties as they are identified in the caption of the action. Indeed, it would be anomalous to do otherwise since the actual names of the parties are used in the caption of the order appealed from, and on the briefs on the companion appeals decided herewith.
In 2011, Kim A. Kaufman (hereinafter the plaintiff) commenced this action for a divorce and ancillary relief against Glenn B. Kaufman (hereinafter the defendant) in the Supreme Court, Westchester County. In June 2011, the parties entered into a so-ordered stipulation which provided for the sale of the marital residence, custody of the children, interim support and maintenance, advances on equitable distribution, and counsel fees.
There is no disagreement between the parties and the Supreme Court that the trial was to be bifurcated, at least to some degree. There is no dispute that the court held a 21-day trial and that not all the issues were the subject of the trial. Despite the extensive pretrial conferences that were conducted and the 21-day trial that was held over the course of two months, the parties and the court are at odds as to what the issues were to be, and were, tried. The parties and the court disagree as to what was bifurcated and how the bifurcation came to be.
At a conference on February 4, 2013, the Supreme Court embarked upon a process pursuant to which the trial of the action was to be bifurcated. After hearing from counsel on whether date of trial valuations of assets should be pursued, the court stated that it would first take testimony on whether the assets in question were active or passive. As the court said: "If I make a determination that they're passive, then I'll have to decide that as part of the case and if we need those additional valuations we'll get them and adjourn the trial for that purpose." After further discussion, the court repeated the procedure it would follow: "So again, it seems to me that for the efficiency of this trial, we should first make a determination of passive or active and if it comes out to be passive then I will allow additional opportunity to do the valuation[s] based upon March 19, 2013. So that's my ruling." While no objection was expressed by either party to this "ruling," it cannot be said that the parties stipulated to this procedure; it can be said that they acquiesced to the court's approach.
On appeal, the plaintiff characterizes the first phase of the trial as a "mini-hearing" on the classification of assets which thereafter "mushroomed" into a lengthy trial that included every issue, other than the plaintiff's request for a final counsel fee award and the valuation of illiquid investment accounts. In support of this version of events, the plaintiff cites the ruling made on [*2]February 4, 2013, and a colloquy held on June 4, 2013, after the conclusion of the first phase of the trial. While the "ruling" of February 4, 2013, tends to confirm the plaintiff's assertion, the discussion held on June 4, 2013, tends to contradict the plaintiff's present characterization of the first phase as having mushroomed out of control. In that June conference, the Supreme Court expressed that there was a "hiatus" so that neutral appraisals could be conducted as to assets not considered at the trial. The plaintiff's counsel proceeded to confirm that the first phase of the trial was focused on identification and classification of assets and that a trial was yet to be held on valuations, arrears, and counsel fees, among other issues. The parties discussed a date for posttrial submissions on the issues that had been tried. The court also stated that it would hold off on a hearing on counsel fees pending the determination to be made after consideration of the parties' submissions.
For his part, the defendant characterizes the bifurcation as having been brought about by stipulation as well as by court directive. According to the defendant, all of the issues were to be the subject of the trial, except for the valuation of certain illiquid assets, counsel fees, and the defendant's request for sanctions. Thus, while the defendant attributes the bifurcation at least partly to a stipulation, the defendant's understanding of the issues being tried and those having been reserved for a later stage is not significantly different from that of the plaintiff. However, the Supreme Court's view is remarkably different.
As set forth in the decision rendered at the end of the first phase of the trial, the Supreme Court perceived that, by stipulation, the trial was bifurcated with the first phase to focus on the classification of assets as being either marital or separate, on whether marital property was active or passive in nature, and on the percentage of each marital asset to be distributed to each party. A second phase was to follow with respect to the valuation of the marital assets, together with the issues of maintenance, child support, counsel fees, contempt, and sanctions.
In any event, a trial was held over the course of 21 days in April and May 2013. In May 2013, a valuation report was prepared by a neutral expert firm. This report was not admitted into evidence during the first phase of the trial and the parties reserved the right to engage their own appraisers.
By decision and order dated April 4, 2014, the Supreme Court denied the plaintiff's motion for an award of $1.2 million in interim counsel fees but, by order dated July 7, 2014, made upon reargument, the court awarded the plaintiff $750,000 in interim counsel fees "without prejudice, to be paid from assets controlled by defendant and subject to reallocation between the parties, or a credit against equitable distribution." In its July 7, 2014 order, the court explained that the 21 days of trial, followed by posttrial briefing, was just the first phase of the trial and stated that the "case is far from over." The court also stated that another phase of the trial was yet to be conducted, which included the valuation of assets. The defendant appealed the award of counsel fees to this court, an appeal which was fully perfected and briefed and is determined herewith (see Kaufman v Kaufman, ___ AD3d ___ [Appellate Division Docket No. 2014-09135; decided herewith]). As reflected in that determination, we are required to dismiss that appeal, as the right of direct appeal therefrom terminated with the entry of the judgment in this action (see Matter of Aho, 39 NY2d 241, 248). The issues raised on that appeal are brought up for review and have been considered on the appeal and cross appeal from the judgment (see CPLR 5501[a][1]).
The defendant, rather than pay the $750,000 counsel fee award, obtained an undertaking to secure the payment in the event of an affirmance on appeal, thus obtaining a stay of enforcement pursuant to CPLR 5519(a). The Supreme Court, by order dated September 19, 2014, denied the plaintiff's motion pursuant to CPLR 5519(c) to vacate the stay. The plaintiff noticed an appeal from the September 19, 2014 order, an appeal which has been fully perfected and briefed and is determined herewith (see Kaufman v Kaufman, ___ AD3d ___ [Appellate Division Docket No. 2014-10829; decided herewith]). As with the defendant's appeal, we are required to dismiss the plaintiff's appeal on the ground that the right of direct appeal therefrom terminated with the entry of the judgment in this action (see Matter of Aho, 39 NY2d at 248). The issues raised on that appeal are brought up for review and have been considered on the appeal and cross appeal from the judgment (see CPLR 5501[a][1]).
In the meantime, on August 11, 2014, the Supreme Court issued its interim decision with respect to the first phase of the trial (hereinafter the first decision). The first decision, consisting of 34 pages, although not free from inconsistency or error, generally provides a thorough and cogent discussion of the contentions of the parties, the facts found, and the court's conclusions as to the issues presented during the first phase.
B. The First Decision
We set forth the salient facts found in the first decision.
The parties were married on May 27, 2000. They had two children, who were 12 and 11 years old at the time of trial. The parties agreed to shared custody and equal parental access. At the time of trial, the plaintiff was 43 years old and the defendant was 45 years old.
The plaintiff attended the School of Museum of Fine Arts at Tufts University and attended graduate school at the Maryland Institute College of Art. After the marriage and the birth of their first child, the plaintiff did not work outside of the parties' Westchester residence, staying home to care for the children, with household help. However, in 2003, the plaintiff began a career in the design and manufacture of expensive, high-end necklaces and brooches. With the aid of funds from the defendant's earnings and the defendant's business acumen, the parties formed KKD Productions, LLC (hereinafter KKD). KKD's productions were afforded significant exposure at international jewelry shows, upscale stores, and designer magazines. However, after the investment by the defendant of approximately $500,000, the plaintiff unilaterally shut down KKD's operations, leaving only some inventory behind.
The defendant was educated at the Wharton School of Business at the University of Pennsylvania, passed the examination to be a certified public accountant, and went on to attain a law degree from Harvard University. While the defendant first worked as an associate at a law firm (where he met the plaintiff), he went on to a career in private equity investment, joining the firm of American Security Capital Partners (hereinafter ASCP) in 1997. The defendant thus began working at ASCP prior to the marriage. He remained at ASCP until the fall of 2008, when his employment was terminated.
The parties experienced marital difficulties in 2005 but stayed together after obtaining marital counseling. Both parties agreed that the marriage deteriorated after the defendant lost his employment with ASCP, though they disagree as to the reasons.
While this action was commenced in February 2011, the parties had previously entered into an agreement which established October 31, 2010, as the "cut off" date for the determination of what would be included in the marital estate. The parties physically separated in the summer of 2011. The plaintiff, utilizing part of a $1.1 million agreed-upon advance against equitable distribution, purchased a townhouse. Following the sale of the marital residence, the defendant moved to a rented residence located near the plaintiff's home.
ASCP had a complex business structure. ASCP was a parent company which employed the defendant, and others, as W-2 wage earners. ASCP formed and controlled a number of investment management limited liability companies (hereinafter LLCs), which provided professional management services to affiliated investment limited partnerships (hereinafter LPs). Investment capital was raised from within ASCP and from outside investors as well. The capital was used to pay the fees and expenses of the LLCs and to acquire private equity interests in companies targeted for takeover (hereinafter the portfolio companies), which interests were held by the LPs. The defendant's duties were to identify suitable companies for purchase, using his analytic and valuation skills and expertise. For his investments in the LLCs, the defendant received a distribution of profits, which took the form of income provided by the services generated by the LLCs to the LPs. For his interests in the LPs, the defendant received distributions and a share of the profits paid to the LPs by the portfolio companies.
The Supreme Court found that, contrary to the defendant's assertions, the parties had formed an economic partnership and jointly pursued financial success and supported each other's careers. While the defendant was an active participant in all aspects of his finances while with ASCP, the plaintiff made both direct and indirect contributions to the defendant's endeavors.
The Supreme Court found that, while the defendant's interests in ASCP and ASCP-related holdings were his separate property, the plaintiff was entitled to a 25% share in the appreciation of these holdings. The court did not provide any guidance as to which assets it considered "ASCP-related" and which were not so related. Since there was the possibility of a "clawback" of certain funds, the plaintiff was required to contribute 25% to any such clawback and, if she did not do so voluntarily, she would be obligated for the defendant's attorneys' fees and litigation expenses. The court determined that the ASCP holdings should be valued as of December 31, 2012, representing the year end just prior to the April 2013 trial date.
The Supreme Court ruled that, as to assets which were not ASCP-related entities, the plaintiff was entitled to a 15% share. Again, the court did not specify which assets were subject to a 15% share and which were subject to a 25% share by the plaintiff. The court concluded that the plaintiff did not provide any direct contributions to the defendant in relation to the non-ASCP [*3]entities and that, as to them, her contributions were limited to her management of the household and the parties' personal matters as "general manager of the household." The court directed that the non-ASCP assets be valued as of the agreed cut-off date.
Of significance, and as noted above, the Supreme Court did not name or otherwise identify the entities it considered to be ASCP-related or those it considered to be not ASCP-related. Rather, the court stated in a footnote that the determination of the assets included within the ASCP family of funds and the non-ASCP funds would be further developed and ruled upon during phase two of the trial.
To complicate matters further, the Supreme Court held that any item of personal property not already distributed to the parties should be distributed equally. The court did not specify the personal property that was subject to this provision and did not explain its reasoning for a 50/50 division of such property.
The Supreme Court also found that, throughout the marriage, the defendant deposited his earnings from all sources principally into two accounts, an account at Citibank and a Fidelity brokerage account, referring to these accounts as "operating accounts." These funds, found the court, were used by the defendant to make capital contributions to investments and to pay the parties' personal living expenses. The court found that the defendant provided the plaintiff with $10,000 each month. The court stated that the defendant had retained sole dominion and control over these two operating accounts. The court determined that the funds in the operating accounts had been commingled, such that the funds would be considered a marital asset. However, the court stated: "[t]he final determination of the amounts to be equitably distributed await the second phase of the trial that will address, inter alia, the valuation of the assets." The court pledged that "[i]n phase two of this trial, when the valuations of the assets are fully before the court, defendant will be entitled to prove his separate property, pre-marital contributions, and receive a credit therefore [sic]."
The defendant had argued that ASCP distributions received by him after the 2008 termination of his employment should not be classified as marital property, as he was required to adhere to restrictive covenants included in the governing subscription agreements. The Supreme Court did not accept the defendant's claim that post-termination distributions should be treated as the equivalent of income earned after the cut-off date.
The defendant possessed a claim against ASCP for additional compensation due him under a letter agreement. The defendant testified that he held off commencing litigation on this claim pending the completion of the matrimonial action. The Supreme Court directed that the plaintiff would be entitled to 25% of any recovery on this claim, after deduction of attorneys' fees and litigation expenses. Conversely, if the defendant's claim was litigated unsuccessfully, the plaintiff would be liable to the defendant for 25% of his attorneys' fees and litigation expenses.
Prior to the October 31, 2010 cut-off date, the defendant started his own private equity fund, D Cubed Group (hereinafter D Cubed). The Supreme Court determined that while the defendant's interest in D Cubed was a marital asset, the plaintiff was not entitled to any award with respect to that asset, as the economic partnership of the parties had ended at or about the time of D Cubed's formation. For similar reasons, the court denied the plaintiff any interest in the defendant's shares of Red Robin Gourmet Burgers, Inc.
The marital residence was sold in October 2012. The defendant was granted a separate property credit of $90,914, leaving a balance of the net proceeds of sale of approximately $2.18 million, which was to be divided equally between the parties.
C. The Second Decision
On April 9, 2015, the Supreme Court issued a two-page order (hereinafter the second decision). In that order, the court recited that, on January 7, 2015, during a conference, it had ruled from the bench that the assets set forth on a list of assets and liabilities as of the cut-off date, referred to as Exhibit D18, would be equally distributed between the parties, unless specifically excluded "hereinafter." The court stated that the distribution would be predicated upon a valuation date of October 31, 2010, subject to separate property contributions and subject to potential prejudgment interest. The court then proceeded to give the defendant a $105,293 separate property credit for the Fidelity Brokerage Account and a $239,190 separate property credit for a Fidelity IRA, while granting the plaintiff a $32,000 credit for a separate Fidelity IRA. The court explained that the assets to be equally divided were funded by the defendant's marital earnings and were marital property. These assets, said the court, were invested by the defendant in investments that did not require any particular acumen on his part. The court distinguished these assets from the assets that it had directed previously be divided either 75/25 or 85/15. On the other hand, the court stated that the [*4]assets to be divided in a non-equal fashion were also listed on Exhibit D18 and that these assets included "Hedge Funds, Private Equity Funds [non-ASCP related], Private Equity Funds [ASCP related] and Private Company Investment . . . ." The court explained that the defendant made a greater contribution than the plaintiff did as to the non-equal assets. Again, the court did not specify which assets it considered to be ASCP-related.
The transcript of the January 7, 2015 conference reflects that the Supreme Court simply announced that bank accounts, brokerage investment accounts, retirement accounts, real estate, and mutual funds would all be divided 50/50 as of October 31, 2010. The only explanation for this ruling came in the following colloquy:
THE COURT:...So that's your ruling that you should have the relief from me. As I recall, there was argument last September 19th where my interim decision did not articulate that specifically. So basically what I'm saying is I include these accounts for purposes of my decision as being non-ASCP accounts.
[Plaintiff's counsel]:As being —
[Defendant's counsel]:You're saying that they are non ASCP accounts?
THE COURT:But they are the equivalent, they are 50/50.
[Defendant's counsel]Can I get an explanation as to why because —
THE COURT:The explanation is that's my ruling based on everything that I [have] already written in this case.
[Defendant's counsel]And in the August 4th, 2014 decision, I didn't read anything that would indicate that was a possibility.
THE COURT:Well, when you read on, again, using D18, Hedge Funds and all of page two are either 15 percent or 25 percent, up to—
***
Okay, Hedge Funds, anything that is non-ASCP, between Hedge Funds on the bottom of page one, okay, and through private company investments, Argo, eTouches and GK. They are either 15 percent or 25 percent.
So everything that is ASCP associated, which on page two is private equity funds, American Securities funds, those were 25/75. Hedge funds, private equity funds, private company investments, those are 15 percent. I think I already ruled as far as restricted stock and stock options, I've already ruled on Red Robin. I have already ruled on Kim Kaufman Designs and I already ruled on D Cubed Group and Mallard Holdings. There is the ruling you need. (emphasis added).
As is evident from the transcript, the Supreme Court acknowledged that in its first decision it had awarded the plaintiff 25% of the defendant's ASCP related interests and 15% of the defendant's non-ASCP related interests. While the court acknowledged that it was treating the bank accounts, brokerage investment accounts, retirement accounts, real estate, and mutual funds as non-ASCP, it did not explain why it was using a 50% distribution percentage, rather than the 15% distribution percentage applicable to non-ASCP assets. Nor did it explain why it was not going to [*5]take evidence to develop a record as to which assets were ASCP-related, though it previously said it would.
D. The Third Decision
The Supreme Court issued a decision and order dated February 29, 2016 (hereinafter the third decision). Even though the court had proceeded on the assumption that there would be at least one additional phase to the trial, in the third decision, the court decided that it had heard enough, after holding 10 conferences, and proceeded to rule on the remaining issues before it. The court declined to consider the reports of the jointly-retained valuation expert who provided valuations of assets as of the October 31, 2010 cut-off date and as of March 31, 2013, on the eve of trial. Neither report had been received in evidence at what was supposed to be the first phase of the trial. The court accepted the view of a forensic accountant for the plaintiff who, in an affidavit submitted in connection with a request for fees, opined that it would not be necessary for the court to grapple with the valuation issues if the court directed that the plaintiff's share in investment funds be distributed to her on an "if, as and when" basis. Under this method, the expert explained, the court would award the plaintiff a percentage of all distributions, less capital calls and clawbacks, from a given date plus a percentage of all future distributions and sales proceeds. However, the record does not reflect whether the plaintiff, let alone the defendant, agreed to utilize the "if, as and when" approach and thereby entirely cast aside the neutral forensic report and the parties' respective partisan critiques thereof.
The Supreme Court determined that bank accounts identified in Exhibit D18, valued as of October 31, 2010, should be divided equally, with the defendant owing the plaintiff $570,202 on account thereof. The court decided that brokerage accounts, valued at $9,388,261, should be divided equally, with the defendant to receive a separate property credit of $105,293, resulting in the defendant owing the plaintiff another $4,588,838. Mutual funds were to be divided equally, with the defendant owing the plaintiff $199,033 on account of these assets.
The Supreme Court next dealt with the tax impact of the distribution of marital assets. The court decided that for each tax year from 2010 until asset distribution occurs, the amount of tax attributable to the plaintiff on account of her one-half share of marital assets should be ascertained by calculating what the plaintiff would have paid in taxes had the assets been distributed to her as of November 1, 2010. The defendant was then to deduct the plaintiff's putative tax liability from the gross proceeds otherwise due her. The record does not reflect what, if any evidence, expert or otherwise, the court had before it in deciding the issues of tax impacting.
The Supreme Court determined that three retirement accounts should be divided equally, subject to the plaintiff and the defendant each receiving credit for premarital contributions.
The Supreme Court then addressed the distribution of the hedge funds, ASCP-related funds, and other assets, which were the subject of the first decision. The court decided to distribute these assets on an "if, as and when" basis. If the proceeds of these funds were already received by the defendant, then he was to pay the plaintiff her percentage share of them. Otherwise, the defendant was to pay the plaintiff her share of distributions within 30 days of receipt. These assets were to be tax impacted based on the same methodology outlined with respect to the other assets.
With regard to the defendant's claim against ASCP, the Supreme Court reported that the defendant had accepted ASCP's offer to pay him $1 million to settle the dispute. The court directed the defendant pay the plaintiff $250,000 as her share of that asset, less an amount equal to the income tax she would have paid on that amount in the year it was received.
The Supreme Court decided that the plaintiff should receive prejudgment interest. At first, the court stated that an award of prejudgment interest at a rate of 5% would be "fair and reasonable." The court expressed that it could not predict how the plaintiff would fare on investing the funds now being awarded to her, but also that the use of the statutory 9% rate would be excessive, in light of the defendant's maintenance payments over the past several years. However, having stated that 5% would be a fair and reasonable rate of interest, the court proceeded to declare that the plaintiff would be entitled to prejudgment interest at a rate of 6% from November 1, 2010, as to the value of bank accounts, brokerage/investment accounts, and mutual funds (but not retirement funds). The plaintiff was also awarded prejudgment interest with respect to the hedge funds, equity funds, and private company investments. There is no indication in the record as to what, if any, evidence or other materials the court relied upon in fixing the interest rate.
The Supreme Court directed that the defendant be given a credit for one-half of the real estate taxes he paid on the marital residence prior to its sale. The defendant was also given a credit for one-half of certain credit card payments he made.
The Supreme Court declined to award permanent maintenance to the plaintiff. The court reasoned that the plaintiff was going to receive at least the sum of $5,159,039, based on her one-half share of bank accounts and brokerage and investment accounts, with the plaintiff to receive additional monies from distributions of other assets. The court determined that the defendant's obligation to pay interim maintenance would terminate once the plaintiff received $5 million in hand in non-retirement assets. Until then, the defendant was to pay the plaintiff $10,000 per month, although such payments were to be considered an advance on equitable distribution, as long as in the final determination of the case (including after appellate review), the plaintiff receives at least $5 million.
The Supreme Court determined to calculate child support on the basis of a combined parental income of $350,000, which the court apportioned equally between the plaintiff and the defendant. Thus, basic child support was fixed at $87,500 per year, of which the defendant was responsible for one-half, $43,750, which amounted to $3,646 per month. However, in the event the plaintiff did not receive her equitable distribution within 30 days of service of the judgment of divorce, the defendant was to continue to pay $7,295 per month ($87,540 per year). The parties were to equally share the "add-on" expenses, as well as other expenses not included in either basic child support or in the statutory add-ons. The court urged, but did not direct, the parties to mediate any disputes as to these additional expenses. Each party was allowed to claim one child as a dependent for tax purposes. The defendant was required to maintain health insurance for the children, with the parties to equally share any extra cost therefor. The children's UTMA accounts were to be maintained for their benefit by the defendant. Likewise, the children's 529 accounts were to be maintained and used for their higher education.
The parties' "so-ordered" stipulation of June 2011 provided that if the defendant paid the plaintiff interim spousal and/or child support from marital assets, then the marital estate, at the time of equitable distribution, was to be deemed increased by the amount of such payments. To implement this provision, the Supreme Court directed that, to the extent the defendant used marital funds from bank accounts and investment accounts to pay interim support, the defendant was to reimburse the plaintiff for one-half of such amounts.
The Supreme Court addressed the issue of counsel fees, finding that the amount expended by both parties on legal fees had become a flashpoint. The court found that, pursuant to stipulation and subsequent court rulings, a total of $950,000 had been paid out of marital assets to the plaintiff's counsel. The court recounted, as previously set forth herein above, that in an order of July 7, 2014, made upon reargument, it had awarded the plaintiff interim counsel fees of $750,000, payable out of assets controlled by the defendant. That award, however, was made subject to reallocation between the parties or as a credit against equitable distribution. The defendant appealed that order and obtained a stay of enforcement by the filing of an undertaking (see CPLR 5519). The court, by order dated September 19, 2014, denied the plaintiff's motion to vacate the stay. The plaintiff appealed that order. In December 2014, the court directed that the balance of the plaintiff's share of the net proceeds of the sale of the marital residence, $453,000, be paid directly to her counsel.
The Supreme Court stated that it would be fair and equitable for the defendant to be responsible, out of his own assets, for $1.5 million of the plaintiff's counsel fees. The court therefore awarded the plaintiff $1.5 million "as and for interim counsel fees." The court also provided that $555,000 was to be credited against the defendant's 50% share of funds previously advanced from marital assets, with the balance of $945,000 payable by the defendant within 30 days of service upon him of the judgment of divorce with notice of entry. Thus, while the court described the $1.5 million award as an interim award, it provided that the amount was to be paid upon service of the judgment of divorce and, indeed, at the end of the decision, directed the settlement of the judgment of divorce.
While the Supreme Court determined that the $1.5 million was to supersede the $750,000 interim award, the court proceeded sua sponte to "reconsider" its previous denial of the plaintiff's motion to vacate the stay of enforcement of the $750,000 award. While the court seemingly intended to vacate the stay, it did not expressly so state and it did not direct a date by which the $750,000 was to be paid. However, the court apparently assumed that the $750,000 would be paid promptly since it provided that the payment of $750,000 would be credited against the $945,000 balance due on the $1.5 million award, leaving the defendant to pay $195,000.
The Supreme Court explained that a hearing on the issue of counsel fees was not necessary since all of the fees awarded were made pursuant to pendente lite applications and "there are no further fees owing and due plaintiff from defendant." The court stated: "That is, on these facts [*6]and the law, the court declines to make a final counsel fee award to plaintiff based on the $1.5 million pendente lite counsel fee award granted herein and in the past."[FN1]
We note that the Supreme Court's determination not to conduct a hearing with respect to the plaintiff's application for a final award of counsel fees is at variance with its repeated prior assurances that it would hold such a hearing.
The defendant now appeals from the third decision. This appeal must be dismissed because the right of direct appeal therefrom terminated with the entry of the judgment in the action (see Matter of Aho, 39 NY2d at 248). The issues raised on the appeal from the third decision are brought up for review and have been considered on the appeal and the cross appeal from the judgment (see CPLR 5501[a][1]).
E. The Fourth Decision
Motion practice ensued with respect to the settlement of a judgment, with the plaintiff seeking to "reargue" the third decision and to have the Supreme Court modify, correct, direct, and clarify portions of the third decision. On June 17, 2016, the court issued a decision and order determining the plaintiff's motion in which the court, in effect, granted reargument and made certain changes to the third decision (hereinafter the fourth decision).
The Supreme Court noted that the parties had come to an agreement regarding the final calculations as to the distribution of the net proceeds of the sale of the marital residence. As a consequence, the court, using those calculations, determined that each party was entitled to a one-half share, subject to the defendant's receipt of a separate property credit. The defendant was awarded a total of $1,183,329 and the plaintiff was awarded a total of $1,092,415. The court also adopted the parties' agreement as to the methodology for the division of the Fidelity brokerage accounts. After accounting for a separate property credit to the defendant, these funds were to be divided equally, with the result that the defendant was to receive $4,746,777 and the plaintiff was to receive $4,641,484.
The Supreme Court stated that it had made an oversight in failing to direct the defendant to provide life insurance to cover his equitable distribution obligation. The court directed the defendant to maintain an existing $2 million policy with the plaintiff as beneficiary until the defendant's obligations to "fund plaintiff's distributive award have been paid in full." The court identified sua sponte the discrepancy in the third decision as to the interest rate to be applied in calculating prejudgment interest. The court stated that the interest rate would be 6%, rather than 5%, though it did not explain its reasoning.
F. The Judgment
The court entered a judgment dated July 21, 2016. The judgment granted the plaintiff a divorce, provided for the custody of the children, and set forth provisions for child support. The judgment provided that "all equitable distribution and ancillary issues shall be in accordance with this Court's [first decision]," except as otherwise specified. These exceptions consisted of: (a) the agreed calculations as to the distribution of the net proceeds of the marital residence; (b) the agreed calculations as to the distribution of the Fidelity brokerage account; (c) allowing each party to claim one child as a dependent on tax returns; (d) only the incremental cost of covering the parties' children on health insurance was to be an "add-on" expense; (e) Qualified Domestic Relations Order (hereinafter QDRO) preparation costs was to consist only of the costs of a third party retained to prepare a QDRO, and not those of the parties' counsel; (f) the defendant was to maintain his $2 million life insurance policy for the plaintiff's benefit pending payment of the plaintiff's distributive award; and (g) prejudgment interest was to run at 6% on the value of the bank accounts, brokerage/investment accounts, mutual funds (but not the retirement accounts or on a $1.1 million advance), and hedge funds.
The defendant now appeals, and the plaintiff cross-appeals, from stated portions of the judgment of divorce.
II. Equitable Distribution
On appeal, the defendant argues that the Supreme Court violated his right to due process and fundamental fairness by failing to conduct the second phase of the trial. The defendant does not contest the court's determination to bifurcate the issues; indeed, the defendant asserts that the bifurcation was the product of a stipulation, the implication being that the parties agreed to [*7]bifurcate the issues. The defendant's contention is that the court ended the case without ever providing him with the promised second phase of the trial, thus undercutting the trial structure upon which he relied and denying him the opportunity to submit evidence on the significant issues that the court decided without a hearing. Despite the defendant's due process argument being Point I in his supplemental brief, the plaintiff's only rejoinder, found in Point VI in her supplemental brief dealing with separate property credits, is her assertion that the defendant "is not entitled to a second trial regarding the illiquid investments [because] his claims were squarely rejected after the 21-day trial."
A. Bifurcation
The Equitable Distribution Law mandates that, whenever a marriage is terminated, absent an agreement of the parties, the court must determine the rights of the parties in their separate and marital property and provide for the disposition of the property in the final judgment (see Domestic Relations Law § 236[B][5][a]). In determining the equitable distribution of marital property, the court is required to consider 14 specific factors and may take into account any other factor the court finds just and proper (see Domestic Relations Law § 236[B][5][d]). The court is obligated to render a decision in which it sets forth the factors it considered and the reasons for its decision, a requirement that cannot be waived (see Domestic Relations Law § 236[B][5][g]). In the absence of express findings of fact and of a detailed discussion of the enumerated factors, meaningful appellate review is precluded and a remittal for further fact finding may be required (see Gape v Gape, 110 AD2d 621; see also Kluge v Kluge, 159 AD2d 968). Facts must be sufficiently developed at trial to enable a reasoned determination of the issues of equitable distribution and, if not, a new trial may be ordered (see Madu v Madu, 135 AD3d 836, 837; McLoughlin v McLoughlin, 74 AD3d 911, 915). In this case, the Supreme Court partially succeeded and partially failed in its duty to develop an appropriate record and render a reasoned decision.
The trial court has the authority, if not the responsibility, to control the sequence of the trial. CPLR 4011 provides that the court may determine the sequence in which the issues are to be tried and otherwise regulate the conduct of the trial in order to achieve a speedy and unprejudiced disposition of the matters at issue. In complex cases, the court is duty bound to manage the proceedings for the purpose of avoiding unnecessarily protracted or confusing presentations of evidence (see Feldsberg v Nitschke, 49 NY2d 636, 643). Carving out discrete issues may enhance the presentation of evidence and make the trial process more efficient. Defining the issues for trial, and providing for the sequence in which those issues are tried, may facilitate the litigation, reduce delay, and aid the prospects of a complete disposition through the resolution of the core of a dispute. On the other hand, where the bifurcation of issues may tend to exacerbate or prolong the matrimonial litigation, then it should not be utilized.
Even where the bifurcation of issues in order to streamline the presentation of evidence is appropriate, the rendition of piecemeal decisions is inadvisable where the court is prevented, through the cabining of the issues, from assessing the economic circumstances of the parties as a unified whole. The amount and value of separate property may be a factor in the distribution percentage of marital property. Equitable distribution Factor 1, consideration of the income and property of each party (see Domestic Relations Law § 236[B][5][d][1]), may lead the court, when most of the assets are the separate property of one spouse, to take the disparity into account by awarding a greater share of the marital property to the less affluent spouse. Likewise, whether the court determines that property should be valued as of time of commencement or as of time of trial, evidence of value on other dates is admissible. The court, in fashioning an appropriate distribution, should be cognizant of changes in value along the way in order to provide a full and complete framework for a just and fair decision.
Moreover, before rendering piecemeal decisions, the trial court should be cognizant of the consequences that may ensue upon its entry of appealable orders. It is not unreasonable to expect that where an appealable, interlocutory order is entered, a disappointed party, or perhaps even both parties, may appeal it. That may be followed by further appeals and cross appeals. This creates expense to the parties and can also lead to delays, particularly where a stay is formally granted or where the parties and the trial court agree to defer further proceedings until the pending appeals are resolved. From an appellate perspective, it is highly undesirable to review separate decisions on the basis of separate records. Here, the prolixity of events in the Supreme Court and the ensuing appeals and cross appeals led to four separate appellate dockets and appendices totaling over 25 volumes.
It should also go without saying that when the court decides to bifurcate the issues, it should clearly define, prior to the start of the trial, the issues that are to be presented at each phase [*8]of the trial and to consistently adhere to that definition as matters proceed. Counsel and the parties are entitled to know, prior to the commencement of the trial, what issues are being tried and should not be blindsided by an abrupt and unanticipated change in the trial sequence. Likewise, where the court bifurcates the issues and renders a decision after hearing the first issue, the court should follow its own decision consistently through the balance of the trial.
The parties are free to chart their own procedural course by stipulation; stipulations are binding when made in a signed writing or in open court (see CPLR 2104; March Assoc. Constr., Inc. v CMC Masonry Constr., 151 AD3d 1050, 1054; see also Matter of Alfieri v Bravo, 172 AD3d 1360). In this case, because the record contains no evidence of either a written stipulation or a open-court stipulation, we cannot say that the parties stipulated to the bifurcation of the issues. On the other hand, neither the plaintiff nor the defendant objected to bifurcation at the time or is presently objecting to the fact of bifurcation. Accordingly, we proceed on the basis that the issues were effectively bifurcated. That said, it remains to be examined what was bifurcated since the terms of the bifurcation were expressed, at times inconsistently, at various conferences, including a conference after the completion of the first phase of the trial.
After a thorough review of the record, we accept the Supreme Court's view that the trial was bifurcated with the first phase to focus on the classification of assets as being either marital or separate, on whether marital property was active or passive in nature, and on the percentage of each marital asset to be distributed to each party. Although the record is not as clear as it should be, we observe that the plaintiff is not complaining on appeal that the court exceeded, in its first decision, the scope of its proclaimed bifurcation. Nor does the plaintiff complain that she was deprived of the opportunity to present all of her evidence on any of the points in contention on appeal. The defendant is not complaining about the scope of the issues decided in the first decision; his complaint is, for the most part, that the court did not hold a second phase of the trial before deciding the issues left for the second phase. Since the parties are, at bottom, not contesting the scope of the first decision, although they take issue with aspects of its substance, we will accept that the bifurcation was supposed to be as outlined by the court in its first decision.
B. The Appropriate Distribution Percentage
As previously noted, the Supreme Court awarded the plaintiff 15% of the defendant's interest in non ASCP-related assets, 25% of the defendant's interest in ASCP-related assets, and 50% of the parties' liquid assets. The defendant does not take issue with the 75/25 division of the ASCP-related assets but contends that the court, in effect, overruled itself by changing the 15% award on account of non-ASCP assets into a 50/50 division of all liquid assets. The plaintiff asserts that the court appropriately distributed the parties' savings equally, but should have divided all non-ASCP assets equally as well. The parties do not provide any guidance in their briefs as to which assets they each consider to be ASCP-related and which they do not. Nor do they provide any meaningful calculations as to the practical consequences of the distribution percentages, i.e., how much money in dollars would end up with each party. In approaching this issue, we note that neither party contends that he or she was deprived of the opportunity to present all evidence relevant to the determination of the appropriate distribution percentage.
"In recognizing marriage as an economic partnership, Domestic Relations Law § 236 mandates that the equitable distribution of marital assets be based on the circumstances of the particular case and directs the courts to consider a number of statutory factors" (Fields v Fields, 15 NY3d 158, 170). These factors include the income and property of each party at the time of the marriage, and at the time of the commencement of the action; the duration of the marriage and the age and health of the parties; the extent of any maintenance award; the nontitled spouse's direct or indirect contributions to the marriage, including services as a spouse, parent, wage earner and homemaker; the liquid or illiquid character of the marital property; the probable future financial circumstance of each party; the tax consequence to each party; the wasteful dissipation of assets by either spouse; and any transfer or encumbrance made in contemplation of a matrimonial action without fair consideration (see Domestic Relations Law § 236[B][5][d]).
"'The trial court is vested with broad discretion in making an equitable distribution of marital property . . . and unless it can be shown that the court improvidently exercised that discretion, its determination should not be disturbed'" (Eschemuller v Eschemuller, 167 AD3d 983, 984, quoting Linenschmidt v Linenschmidt, 163 AD3d 949, 950 [internal quotation marks omitted]). However, we are also mindful of the general principle that, in reviewing a determination made after a nonjury trial, the power of this Court is as broad as that of the trial court and we may render the judgment we believe warranted by the facts, bearing in mind that in a close case, the trial judge had [*9]the advantage of seeing the witnesses and hearing the testimony (see Northern Westchester Professional Park Assoc. v Town of Bedford, 60 NY2d 492, 499; Cauthers v Cauthers, 32 AD3d 880; PFT Tech., LLC v Wieser, 181 AD2d 836, 838). Where a determination as to equitable distribution has been made after a nonjury trial, the trial court's assessment of the credibility of witnesses and the proffered items of evidence is afforded great weight on appeal (see Goodman v Lempa, 168 AD3d 914, 915; Linenschmidt v Linenschmidt, 163 AD3d at 950; Diwan v Diwan, 135 AD3d 807, 808).
In evaluating the parties' respective contentions on appeal, we view the first decision as having been deficient in its execution of its mandate with respect to the issues that were to be decided at the end of the first phase of the trial. As the Supreme Court acknowledged in its first decision, the first phase was supposed to include a determination of the percentage of each marital asset to be distributed to each party. However, the first decision expressly left the determination of the equitable distribution of the operating accounts to the second phase of the trial. While the broad statement in the first decision that any items of personal property not already distributed would be divided equally could conceivably be read as covering the operating accounts, such a construction is strained and unreasonable given the express reservation of the issue of the operating accounts to the second phase. While it appears that the court somehow read its first decision as providing for an equal division of a wide variety of liquid assets, including but not limited to the operating accounts, that reading was inconsistent with its determination in the first decision to award the plaintiff only 15% of the non-ASCP funds, with those funds to be specified at a later date, and to withhold its decision on the operating funds until later as well. Because of these fundamental flaws in the court's determinations, we afford them less deference than would otherwise be the case.
We disagree with the Supreme Court's determination, as set forth in the first decision, to award the plaintiff only 15% of the non-ASCP assets, whatever those assets may be. A thorough review of the aforementioned Domestic Relations Law § 236 factors reflects that a more appropriate equitable distribution of the parties' investment assets is accomplished by directing that the plaintiff is entitled to 25%, and the defendant 75%, of the parties' investment assets, regardless of whether the assets are deemed related to ASCP. We see no basis, on the facts presented, for discriminating between the percentage to be awarded to the parties based on whether the investment assets were ASCP-related or not.
On the other hand, the Supreme Court should have, to be consistent with its bifurcation of the case, reached the issue, in the first decision, of the percentage of distribution to be applied to the parties' other assets, especially the operating accounts. The direction for bifurcation, as the court acknowledged, provided that the issues relating to the percentage award for marital assets were to be heard and decided in the first phase of the trial. The court did not provide a basis for leaving that issue to the second phase. Moreover, when the court did reach the issue, it decided, in a most conclusory manner, that the defendant's bank accounts, brokerage accounts, and mutual funds should be equally divided. While we agree with the court's finding that these assets were funded through the commingling of the defendant's earnings and his investments, that finding does not warrant an award to the plaintiff which is double what the court would have awarded her on account of the ASCP assets. The percentage of the award to the plaintiff on account of the defendant's bank accounts, brokerage accounts, retirement accounts, and mutual funds should be 25%, regardless of whether such assets are considered to be ASCP-related.
With respect to the income and property of each party at the time of the marriage, the defendant entered the marriage as an Ivy League-educated attorney and a certified public accountant with seven years of experience as an investment professional in the field of private equity, with at least $638,000 in assets, and investments in various funds that would distribute millions of dollars during the parties' marriage and which were used, along with marital earnings, during the marriage to acquire millions of dollars in marital assets. The plaintiff entered the marriage with a Master's Degree in Fine Arts, an insubstantial income working for an internet-based start-up business that calendared art shows and events, and insubstantial assets after the defendant had paid off some of her student loans. The plaintiff was interested in pursuing a career utilizing her artistic creativity, but was unable to do so without adequate funding. The parties married on May 27, 2000, and purchased a marital residence in Rye in August 2002 using a $702,000 distribution that the defendant received from a premarital asset, and by the defendant's liquidation of another premarital asset for $90,914. The defendant put title to the marital residence in joint names, but assumed the mortgage in his sole name.
During the parties' marriage, the defendant was highly successful in the field of private equity, with acquisitions of equity interests in various funds yielding pre-tax distributions of $11,758,599. However, by the time of the trial in this action, the defendant had been effectively unemployed for four years, with his efforts to start his own private equity firm being largely unsuccessful. During the parties' marriage, the defendant invested nearly $500,000 in the plaintiff's part-time business venture, KKD, which involved the sale of luxury jewelry items. By contrast, the plaintiff made no notable contributions to the defendant's career during the parties' marriage, and her contention that the defendant benefited by the plaintiff's socializing in Greenwich and Rye is not supported by the record.
Moreover, the plaintiff was unemployed or only working part-time during the marriage. The parties employed the assistance of outside help, including a weekday nanny, a weekend nanny, a house cleaner, and a "house assistant." They employed a multi-person staff responsible for cooking, cleaning, shopping, transporting the children, and maintaining the home. While the defendant worked for most of the marriage, and provided the support for the family throughout the marriage, the plaintiff's contributions to the marriage, after the first three years of the marriage, were de minimis. Based on the record before us, we cannot conclude that the plaintiff made substantial direct or indirect contributions to the marriage. After the first three years of the marriage, she embarked upon her own career in the design and sale of expensive jewelry, an endeavor which the defendant supported. However, after inducing the defendant to invest further sums into the business, the plaintiff abruptly closed it contemporaneously with her commencement of this litigation.
The presence of household help has been recognized as a significant factor in the equitable distribution in marital property, and the presence of a "live-in babysitter" should be considered with respect to the parties' respective contributions to the marriage (see Marcellus-Montrose v Montrose, 84 AD3d 752, 754; Oliver v Oliver, 206 AD2d 967, 967). Here, in issuing a determination regarding equitable distribution, we should take into account the extent to which the parties each contributed either directly to the economic betterment of the family or indirectly through the performance of "the usual and customary household duties throughout the parties' relationship" (Sade v Sade, 251 AD2d 646, 647; see Hathaway v Hathaway, 16 AD3d 458, 459-460).
Based upon the foregoing, and given the duration of the parties' 11-year marriage, and the amount of separate property contributed by the defendant to the marriage, a fair and equitable distribution of the parties' assets is better obtained by a determination that the defendant is entitled to 75% of the parties' bank accounts, brokerage/investment accounts, mutual funds, hedge funds, and equity funds, whether or not deemed to be related to ASCP, and the plaintiff is entitled to 25% of such assets. Where, as here, the plaintiff made only minor and insignificant economic and noneconomic contributions to the marriage, and a substantial portion of the marital estate derives from the contribution by the defendant of his premarital investments, such a 75% to 25% distribution is equitable (see Doscher v Doscher, 137 AD3d 962 [modifying an order awarding equal division of assets to a division of assets to a 70/30 division]; Scher v Scher, 91 AD3d 842, 846-846 [affirming award of "10% of the value of the various financial accounts"]; Baron v Baron, 71 AD3d 807, 809 [80/20 distribution of assets]; Hathaway v Hathaway, 16 AD3d at 459 [70/30 distribution of assets]; Balsamo v Balsamo, 200 AD2d 649, 649 [70/30 distribution of assets]).
The Supreme Court should not have held that the plaintiff is entitled to 50% of certain of the defendant's investments, which were actively managed by the defendant, and which assets were a function of the defendant's premarital education, experience and assets, while also holding that other similarly situated assets should be divided on either a 75/25 or an 85/15 basis in favor of the defendant [FN2]. Furthermore, the court should not have, on January 7, 2015, sua sponte, orally changed its first decision and, inter alia, awarded the plaintiff 50% of parties' liquid assets, such as bank accounts, brokerage/investment accounts, and mutual funds. The trial court's third decision compounded this error by incorrectly stating that, in the first decision, it had previously awarded the plaintiff 50% of the parties' bank accounts, brokerage/investment accounts, and mutual funds when it had not done so. This error led the court to another error which was to proceed to award, in the [*10]third decision, the plaintiff 50% of the liquid assets, an award that was actually inconsistent with the court's first decision.
Although we recognize that this case is complex and has been highly, if not overly, litigated, the Supreme Court's inconsistent rulings have caused confusion and resulted in additional burdens being imposed upon this Court and the Supreme Court itself and has caused the parties to incur additional counsel fees. Moreover, the court's sua sponte attempt to revise its prior rulings was procedurally improper, as a "trial court has no revisory or appellate jurisdiction, sua sponte, to vacate [its own] order or judgment" (HSBC Bank USA, N.A. v Simmons, 125 AD3d 930, 931 [internal quotation marks omitted]; see Merriwether v Osborne, 66 AD3d 851, 852).
We do not disturb so much of the Supreme Court's determination as provides for an equal distribution of the parties' retirement assets. We conclude that it was not an improvident exercise of discretion for the court to require that the parties' retirement assets, accumulated for purposes of their joint future income security, be divided equally.
C. The Defendant's Separate Property Claims
Although the first phase of trial, as reflected in the first decision, was to deal with the parties' separate property claims, and the first decision did address some of those claims, the first decision inexplicably did not provide any determination with respect to significant separate property claims. Indeed, notwithstanding the Supreme Court's acknowledgment in the first decision that it was to deal with the classification of property into separate or marital in the first phase, in the first decision, the court contradicted itself by reserving the issue of separate property contributions to the operating accounts to the second phase of the trial—which never occurred—even though the parties submitted evidence on these claims during the first phase of trial. Rather than remit the matter for a further hearing, given that the parties had a full and fair opportunity to present their evidence on these claims and that evidence is before us, we will make our own findings:
1. Premarital ASCP Investments
The defendant contends that he should receive a credit for $4,557,923 in distributions made over the course of the marriage on account of five specific investments, related to ASCP, he had made prior to the marriage: Suite 2400 Investors LP; ASP II, LLC; ASP II Professional Investors; ICV Investors, LP; and ICV Associates, LLC. There is no dispute that the defendant had these investments prior to the marriage. There is also no dispute that these distributions were received during the marriage and were used, at least in part, to acquire other investments. While the defendant concedes that the distributions in question were commingled with marital funds, he argues that he should receive a credit for the use of his separate property to acquire marital assets.
The matrimonial courts may, but are not required to, give a spouse who made a separate property contribution to the creation of a marital asset a credit for such contribution before determining how to equitably distribute the remaining value of the asset (see Fields v Fields, 15 NY3d at 167-168). Alternatively, the court may decline to grant a credit and, instead, take the separate property contribution into account, along with all the other relevant factors, in determining the percentage of the asset to be distributed to each party (see id.). As previously discussed, in determining that the defendant should be awarded 75% of the parties' investments, and the plaintiff 25%, we have given consideration to the fact that $4.5 million, out of approximately $11.8 million in distributions from ASCP-related investments during the marriage, emanated from the defendant's premarital property. Under these circumstances, to give the defendant an additional separate property credit for this contribution would be to give him the same credit twice.
2. Post-Commencement Payments
The defendant was employed by ASCP until 2008. After the termination of his employment by ASCP, he received income from two distinct sources. He received distributions from certain investment funds denominated as "AS-Affiliated Investment Entities" (hereinafter the AS Entities). He also received payments from ASCP pursuant to a letter agreement dated May 28, 2007 (hereinafter the Letter Agreement). The Letter Agreement provides, in essence, that unless the defendant voluntarily ceased his employment with ASCP, ASCP would pay him minimum total annual cash payments of at least $2 million per calendar year. The defendant argues that to the extent payments from the two sources were made to him after the commencement of this action, these payments constitute his separate property. The Supreme Court, accepting the position of the plaintiff, ruled that these payments were marital property and, apparently, included the value of them in the distribution to be made to the plaintiff. Both parties contend that the court erred, with the defendant arguing that the court should not have included any of these payments as marital property [*11]and the plaintiff contending that the court did not include certain payments and divided others unequally.
With respect to the post-commencement payments from the AS Entities, since it is undisputed that the interests in the AS Entities are marital property, and the plaintiff has been awarded a 25% share of such investments, we discern no reason why the plaintiff should not receive a pro rata share of the distributions generated by such investments. However, we come to a different conclusion with respect to the payments under the Letter Agreement.
After the defendant's employment was terminated by ASCP, he endeavored to seek alternative employment and start his own private equity firm. However, his ability to do so was limited by restrictive covenants. One barred him from disclosing confidential information and the other prohibited him from soliciting or contacting former employees or investors of ASCP for defined periods of time. These restrictive covenants limited the defendant's ability to discuss his prior professional activities with potential employers and investors and, consequently, limited his income very significantly. The defendant testified without contradiction that the restrictive covenants functioned as non-competes, that is, they effectively limited his ability to compete with ASCP for investors and investments. The defendant attempted to have ASCP limit the restrictive covenants but was not able to do so. It is undisputed that, had the defendant breached the restrictive covenants, apart from the defendant having liability to ASCP, ASCP would have withheld the payments the defendant was due under the Letter Agreement.
The plaintiff argues that the Letter Agreement guaranteeing the defendant $2 million annual compensation was made during the marriage and did not itself require that the defendant perform any services. Hence, the plaintiff maintains, in effect, that the $2 million in annual compensation received after the commencement of the action is the equivalent of a bonus and should be viewed as marital property. We disagree.
Bonus payments, though paid after commencement of a matrimonial action, may be viewed as marital property where such payments are compensation for past performance and are not tied to future performance (see DeJesus v DeJesus, 90 NY2d 643, 650-652; Klauer v Abeliovich, 149 AD3d 617, 623-624). However, where a bonus is an incentive for future services to be rendered after commencement of an action, the bonus is separate property (see Ropiecki v Ropiecki, 94 AD3d 734, 736). Here, while the right to the payments came into existence prior to the commencement of the action, the defendant's receipt of those payments was contingent upon his compliance, including after the commencement of the action, with the restrictive covenants. The payments under the Letter Agreement were, in effect, an incentive to the defendant to comply with the restrictive covenants. While the defendant was not required to do anything affirmatively in order to receive the $2 million under the Letter Agreement, he was required to limit his business activities, and thus his income, in order to continue to receive the payments. Income earned after the commencement of the action would not be marital property. Payments made to substitute for such income would likewise not be marital property. Under these circumstances, payments under the Letter Agreement received after the commencement date of the action should be viewed as the defendant's separate property.
3. KKD
We also agree with the defendant's contention that he should be awarded a credit in the amount of $108,000 in connection with funds invested on August 2, 2010, in KKD at the behest of the plaintiff. As previously noted, KKD was a part-time business venture of the plaintiff involving the sale of luxury jewelry items, in which the defendant invested nearly $500,000 during the course of the parties' marriage. The plaintiff requested and received from the defendant an additional $108,000 investment in KKD on August 2, 2010, only one week before informing the defendant of her intention to seek a divorce, and the plaintiff subsequently ceased operating KKD in contemplation of divorce, and sold off inventory.
We agree with the Supreme Court's finding that the "[p]laintiff is a well educated and gifted artist with apparent income producing capabilities which she abandoned upon the commencement of this case." Given that finding, the defendant is entitled to a credit in the amount of $108,000 for this dissipated asset (see Michaelessi v Michaelessi, 59 AD3d 688, 689; Scala v Scala, 59 AD3d 1042, 1043; see also Owens v Owens, 107 AD3d 1171, 1174). The defendant met his burden of tracing the source of the funds used to purchase these assets to his separate property (see Culen v Culen, 157 AD3d 926, 930; Maddaloni v Maddaloni, 142 AD3d 646, 652; Shkreli v Shkreli, 142 AD3d 546, 548).
4. House Credits
We also agree with the defendant that he should have been awarded certain credits against the proceeds of the sale of the marital residence.
In its first decision, the Supreme Court credited the defendant's testimony that $90,914 of the $792,000 invested in cash in the marital residence came from the liquidation by the defendant of a premarital asset (hereinafter the Tycho asset). While the court gave the defendant a credit for that $90,914, it did not give him credit for another $702,000, which he also testified he contributed to the purchase of the marital residence through the liquidation of a different asset. In declining that credit, the court cited this Court's decision in Williams v Williams (102 AD3d 957, 958), where we held that the wife had failed to satisfy her burden of proving that certain funds used to purchase realty was her separate property.
We decline to disturb the Supreme Court's determination, in effect, that the defendant failed to prove his entitlement to the larger credit. The defendant's testimony with respect to the sale of the Tycho asset and its contribution to the acquisition of the marital residence was supported by documentary evidence showing a specific distribution of $90,914 from the identified asset. In contrast, while the defendant claimed that $702,000 applied to the acquisition of the marital residence was derived from the sale of a specific portfolio company in 2002, the documentary evidence he cited showed only that he received a total of $702,197 from three different entities in 2002, and none of the names of those entities match the name of the portfolio company testified to by the defendant.
On the other hand, the defendant did establish that he was entitled to a credit for 50% of the $100,000 that he spent to repair the marital residence in preparation for its sale (see Zuidema v Zuidema, 270 AD2d 412, 413; Goddard v Goddard, 256 AD2d 545, 547).
In light of the parties having resided in the marital residence for approximately nine years during the marriage, we otherwise agree with the Supreme Court's determination that the net proceeds from the sale of the marital residence should be distributed equally between the parties, with the defendant receiving a separate property credit of $90,914 in addition to the $50,000 credit awarded herein.
D. No Need for a Continued Trial on Certain Issues
Our revised apportionment eliminates the necessity for further proceedings in order to complete the determinations that were to be the subject of the first phase of the trial, i.e., the classification of assets as being either marital or separate, whether marital property was active or passive in nature, and on the percentage of each marital asset to be distributed to each party. Likewise, there is no longer any need for a trial on the issue of whether assets are related to ASCP or not. We have addressed all of the issues that were identified as being the subject of the first phase of the trial.
Additionally, while the defendant had originally contended that we should direct a trial on the valuation issues that the Supreme Court had repeatedly promised, in his supplemental briefs the defendant does not take issue with the court's use of the "if, as and when" approach to valuation, nor does he dispute that the use of that approach renders valuation testimony and findings unnecessary.[FN3]
E. Tax Impacting
The Supreme Court directed that the illiquid assets be distributed on as "if, as and when basis." The court further directed that the income generated by the assets pending distribution be tax-impacted using the plaintiff's hypothetical tax rate, not the actual tax rate that the defendant pays. The parties are in agreement, as are we, that, the court's approach was erroneous. Instead of directing that the plaintiff's tax rate be applied to post-commencement income on investment accounts in the defendant's name in which the plaintiff is entitled to share, the court should have directed that the defendant's tax rate be applied to such income (see Pappas v Pappas, 140 AD3d 838, 840-841). However, the plaintiff should have to shoulder the tax burden only in the same percentage as she shares in the distribution of the asset. Since the plaintiff's share of the illiquid marital assets is 25%, she should be required to absorb 25% of the defendant's tax burden with respect to such assets. Thus, the plaintiff shall be directed to reimburse the defendant for 25% of any [*12]taxes he paid or pays as the result of liquidating assets in order to satisfy his equitable distribution obligations (see id. at 840-841).
There are additional tax matters as to which the parties disagree.
The defendant presented evidence that, as of the October 31, 2010 cut-off date, there was owed an estimated $808,933 in federal income taxes for 2010 and an estimated $192,272 in state income taxes for that year. The record reflects that the defendant filed a separate federal tax return for 2010. According to the tax return, the defendant's federal tax liability was $1,430,480, of which he paid $1,621,547, leaving a refund of $191,067. We agree with the defendant that the taxes accrued as a result of income earned by the parties prior to the October 31, 2010 cut-off date should be viewed as a marital debt and deducted from the value of the marital assets prior to distribution (see Shahidi v Shahidi, 129 AD2d 627, 630). Although the greater part of the parties' assets are not to be divided equally, an equal apportionment of the 2010 tax liability as of October 31, 2010, is appropriate because the parties equally shared in the income to that point in time. However, because the amount of tax actually attributable to income received by the parties from January 1, 2010, to October 31, 2010, is not determinable on this record, a further hearing is required on this issue at which the parties, if they be so advised, may present expert opinion.
As of October 31, 2010, the defendant maintained brokerage accounts with a balance of $9,388,261. The defendant testified that, if that portfolio was liquidated, there would be a capital gains tax liability of $410,288. The Supreme Court directed the defendant to pay the plaintiff $4,588,838 as her share of the brokerage accounts. The defendant complains that the court did not account for the capital gains taxes he will incur upon liquidation of the brokerage accounts in order to fund the distributive award to the plaintiff. The plaintiff argues that the defendant failed to prove what the capital gains taxes would be.
While the defendant did offer evidence that there would be a substantial capital gains tax liability associated with liquidation of the brokerage accounts, and the plaintiff did not counter that evidence, it is far from clear on this record that the Supreme Court's bifurcation of the issues placed tax impacting issues squarely, and exclusively, in the first phase of the trial. Stated somewhat differently, the record does not reflect the parties were on notice that their only opportunity to submit evidence as to tax impacting was during the first phase of what was expected to be a multi-phase trial.
The Supreme Court should not have placed the entire tax burden of satisfying the plaintiff's distributive award of the brokerage accounts upon the defendant. Rather, the plaintiff should be responsible for 25% of the capital gains taxes associated with the defendant's liquidation of the brokerage accounts, provided that the tax impact shall be ascertained as if the defendant had liquidated them on October 30, 2010, and reported the gains on his 2010 tax return. This shall be the subject of further proceedings as to which expert opinion may be provided in order to assist the court in fashioning an appropriate direction.
F. Prejudgment Interest
The defendant objects to the Supreme Court's award of prejudgment interest at the rate of 6% per annum. We agree.
The Supreme Court awarded prejudgment interest with respect to bank accounts, brokerage/investment accounts, and mutual funds (not including retirement accounts), which were valued as of October 31, 2010. While we agree that the plaintiff should be entitled to the income generated by her percentage share of these assets up to the time of distribution, we do not agree that the appropriate means for doing so is to utilize an arbitrary 5% or 6% rate when it would seem that the amount of income generated by these assets is readily determinable. There is no indication in the record as to when the plaintiff first requested prejudgment interest. There is no indication in the record that the parties were afforded the opportunity to offer evidence as to whether the income generated by the parties' liquid assets post-commencement was reasonably calculable, on the court's use of prejudgment interest as a means of recognizing the plaintiff's claim to compensation for the post-valuation date used by the defendant of her share of marital funds, on the interest rate to be applied [FN4], or on whether, and if so, to what extent, the defendant's pendente lite payments and agreed-[*13]upon advance equitable distribution payments to the plaintiff compensated her for the pendente lite deprivation to the plaintiff of the use of her share of the funds in question. Accordingly, we remit the matter for further proceedings on this issue.
The Supreme Court also provided for prejudgment interest on the illiquid assets, such as the hedge funds, equity funds, and private company investments. Since these assets are to be divided on an "as, if and when" basis, we see no grounds for requiring the defendant to pay prejudgment interest on these illiquid assets, particularly given that there is no evidence to the effect that the defendant could either liquidate these assets prematurely or gain any immediate benefit from the funds in these illiquid assets. Rather, to the extent that these assets generate income that is paid to the defendant while these assets are being held by him, the defendant shall pay to the plaintiff her proportionate share of such income, provided that the plaintiff reimburses the defendant for the taxes he pays on such income.
The defendant's claim that he is entitled to credits against equitable distribution on account of sums he paid to the plaintiff for pendente lite maintenance and child support is without merit, except to the extent that he may show during the further proceedings directed herein that the plaintiff, through the temporary maintenance paid to her, has received the benefit of the income generated by her share of the marital assets pendente lite.
III. Maintenance
The Supreme Court determined that, because the plaintiff was going to eventually receive a multi-million dollar equitable distribution award, she should not receive permanent maintenance. However, the defendant was required to pay the plaintiff $10,000 per month until she receives $5 million in equitable distribution, with the $10,000 per month payments credited against, and thus reduce, her equitable distribution award. On the other hand, the court directed that payment of all amounts due under its third decision be made within 30 days of service of the order, not awaiting the entry of judgment. The defendant obtained a stay of the payment directive from this Court.
On her cross appeal, the plaintiff argues that the Supreme Court's maintenance determination erodes her distributive award. She requests that we direct the defendant to pay her $12,500 per month non-taxable maintenance until such time as she receives at least $5 million in equitable distribution, with the monthly payments not to be credited against her equitable distribution. The defendant argues that the plaintiff is not entitled to any additional maintenance; however, the defendant does not advocate for the elimination of the maintenance determination made by the court. His argument as to maintenance is offered strictly as a defense to the plaintiff's cross appeal on that issue. As noted previously, the issue of maintenance was to be taken up at the second phase of the trial, which never occurred. Despite this, neither party contends that a further trial is needed in order to finally determine the issue of maintenance. Consequently, we are required to decide this case solely with reference to the arguments actually made by the parties on the record as it stands. It would not be appropriate for us to decide this appeal "'on a distinct ground that we winkled out wholly on our own,'" without affording the parties notice and an opportunity to be heard (Green Tree Servicing, LLC v Molini, 171 AD3d 880, 882, quoting Misicki v Caradonna, 12 NY3d 511, 519).
"The amount and duration of maintenance is a matter committed to the sound discretion of the trial court, and every case must be determined on its unique facts" (Culen v Culen, 157 AD3d 926, 928; see Carroll v Carroll, 125 AD3d 710, 711). In cases, like this one, commenced prior to amendments to the Domestic Relations Law effective January 23, 2016 (see L 2015, ch 269, § 4), factors to be considered include "'the standard of living of the parties, the income and property of the parties, the distribution of property, the duration of the marriage, the health of the parties, the present and future earning capacity of the parties, the ability of the party seeking maintenance to be self-supporting, the reduced or lost earning capacity of the party seeking maintenance, and the presence of children of the marriage in the respective homes of the parties'" (Gorman v Gorman, 165 AD3d 1067, 1069, quoting Gordon v Gordon, 113 AD3d 654, 655; see Domestic Relations Law former § 236[B][6][a]).
In the context of this case, and under the constraints imposed by the limitations on the arguments presented by both sides, we agree with the plaintiff to the extent that we find it improper for the Supreme Court to have directed that the $10,000 monthly payments be treated as a credit against her equitable distribution award. A distributive award is intended to reflect the equitable distribution of the marital assets between the parties, while maintenance is a support payment awarded to assist the less affluent spouse in meeting his or her reasonable needs in light of the predivorce standard of living (see Hartog v Hartog, 85 NY2d 36, 52; Lipovsky v Lipovsky, 271 AD2d 658, 659). Where a substantial equitable distribution award obviates, or reduces, the need for maintenance, it would not be improvident to provide for, or increase the amount of, maintenance on account of a delay in the payment of the equitable distribution award (see Cowles v Stahmer, 255 AD2d 103, 105). However, it is improper to give the more affluent spouse a credit against equitable distribution on account of the maintenance paid. Doing so essentially means that the less affluent spouse would end up paying his or her own maintenance, though the court determined that the more affluent spouse should be paying maintenance. We therefore eliminate that direction by the court.
We note that it is permissible to adjust an equitable distribution award where it is determined after trial that a temporary maintenance award was excessive (see Johnson v Chapin, 12 NY3d 461, 465-466). However, while such a credit is permissible, it is not mandatory (see Walker v Walker, 130 AD3d 805, 806; Vantine v Vantine, 125 AD3d 1259, 1263). Here, interim support was established by an agreement between the parties, a fact which by itself militates strongly against such a credit. And, more fundamentally, a reduction in equitable distribution to account for an excessive temporary maintenance award is very different from a reduction of future equitable distribution payments on account of final maintenance payments.
We see no basis in this record for increasing the amount of maintenance by $2,500 per month as the plaintiff requests.
IV. Child Support
The plaintiff contends that the Supreme Court failed to properly determine the issue of child support in accordance with the Child Support Standards Act. The defendant rejoins that the plaintiff has nothing to complain about because the court, in the defendant's view, provided for a greater amount of child support than should have been the case. It is with no small amount of irony that we note the defendant's assertion that he did not appeal the child support determination "for the sake of finality." We agree with the plaintiff.
The first phase of this trial was held in April and May 2013. The issue of child support was supposed to be heard in the second phase, which was never held. The Supreme Court, in its third decision, rendered in February 2016, referenced the defendant having an income of $2.5 million in 2014, though the source for that assertion is unclear. The most recent tax return in the record is from 2011. To decide the issue of child support, the court credited the defendant with $175,000 per year in income, imputed to the plaintiff the ability to earn $175,000 per year from her distributive award, decided to "cap" the parties' income for child support purposes at $350,000, and attributed equal responsibility to each party for providing the statutory percentage of basic child support. The use of this shortcut approach was error.
The Child Support Standards Act provides for a three-step method for determining child support. First, the court determines and calculates the parties' combined parental income; second, the court multiplies that figure, up to a baseline amount (presently $148,000), by a specified percentage based on the number of children (here, 25%) and allocates that amount between the parents according to their share of the total income; and third, where the combined parental income exceeds the baseline, the court must determine the child support to be calculated on the amount in excess of the baseline either through the use of the child support percentage or by consideration of a number of statutory factors (see Domestic Relations Law § 240[1-b][b][3], [4]; [c][1], [2], [3]; Matter of Cassano v Cassano, 85 NY2d 649, 653-654).
Where, as here, the combined parental income exceeds the statutory baseline, the court may apply the statutory percentage to all or part of the income over the baseline or it may consider the statutory factors to determine what, if any, additional child support should be awarded. But whatever the court does, there must be "some record articulation of the reasons for the court's choice . . . to facilitate . . . review" (Matter of Cassano v Cassano, 85 NY2d at 655; see Matter of Pittman v Williams, 127 AD3d 755, 756; Finke v Finke, 15 AD3d 615, 618). The court's decision "'should reflect a careful consideration of the stated basis for its exercise of discretion, the parties' circumstances, and its reasoning why there [should or] should not be a departure from the prescribed percentage'" (McCoy v McCoy, 107 AD3d 857, 858, quoting Wagner v Dunetz, 299 AD2d 347, 350-[*14]351 [internal quotation marks omitted]). "'In addition to providing a record articulation for deviating or not deviating from the statutory formula, a court must relate that record articulation to the statutory factors'" (Matter of Pittman v Williams, 127 AD3d at 757 [emphasis omitted], quoting Matter of Gluckman v Qua, 253 AD2d 267, 270-271).
In this case, the Supreme Court failed to make appropriate findings as to the parties' respective combined incomes and the current needs and expenses of the children. In view of its bifurcation of the issues, and the deferral of child support to a later phase of trial that never occurred, the parties did not have a full and fair opportunity to submit their evidence as to their current incomes and as to the current needs and expenses of the children. While the court applied the statutory percentage to $350,000 in combined parental income, it did not provide any explanation as to why it chose that amount, as opposed to some greater or lesser amount, or why the resulting amount of child support was the appropriate level of support. In cases involving high levels of income, the amount of basic support attributable to combined parental income over the statutory baseline should be predicated upon the children's actual needs and the amounts required for the children to live an appropriate lifestyle (see Doscher v Doscher, 137 AD3d at 962; Levesque v Levesque, 73 AD3d 990).
For these reasons, the child support determinations made by the Supreme Court must be set aside, including the allocation of responsibility for statutory add-ons, and the matter remitted to the Supreme Court, Westchester County, for further proceedings. In the meantime, the parties shall abide by the child support provisions of the so-ordered stipulation dated June 23, 2011.
We also agree with the plaintiff that the Supreme Court should have directed the defendant to maintain a life insurance policy for the benefit of the parties' children until the emancipation of the parties' youngest child (see Domestic Relations Law § 236[B][8][a]; Mayer v Mayer, 142 AD3d 691, 696; Lucere v Lucere, 109 AD3d 796, 799; Lueker v Lueker, 72 AD3d 655, 658). Thus, the court should not have limited the defendant's life insurance obligations to providing a $2 million life insurance policy naming the plaintiff as beneficiary for as long as his obligation to pay a distributive award was outstanding. Instead, the court should have directed the defendant to maintain additional life insurance for the benefit of the parties' children until the emancipation of the parties' youngest child, with the requisite amount of such additional insurance to be determined after holding an evidentiary hearing and determination regarding the defendant's child support obligation.
V. Counsel Fees
We agree with the defendant's contention that the Supreme Court erred in awarding the plaintiff $1.5 million in counsel fees without holding an evidentiary hearing, as such award was in the nature of a final award of counsel fees. Despite the court's framing of the $1.5 million in counsel fees as an "interim" award, it was tantamount to a final award, as it was set forth in an order after trial in which the court directed the plaintiff to settle a judgment of divorce on notice in connection therewith.
Where, as here, the parties did not stipulate to waive a hearing, a final award of counsel fees can only be granted after an evidentiary hearing is conducted to permit the opposing party "a meaningful way of testing the [attorney's] claims relative to time and value" (Patterson v Patterson, 302 AD2d 507, 508 [internal quotation marks omitted]; see Tenaglia v Tenaglia, 134 AD3d 801, 803; Terranova v Terranova, 99 AD3d 788, 789; Matter of Musarra v Musarra, 28 AD3d 668, 669). The Supreme Court erred in endeavoring to avoid its obligation to hold an appropriate hearing by simply relying upon the history of interim awards. The requirement of a hearing on counsel fees at the end of a matrimonial case cannot be skirted by asserting that the issue has been resolved through successive interim fee motions and orders.
As noted herein, this case has been extensively, if not excessively, litigated. By statute, there is "a rebuttable presumption that counsel fees shall be awarded to the less monied spouse" (Domestic Relations Law § 237[a]). While the statute creates a presumption that counsel fees are to be awarded to the less affluent spouse, it does not address the amount of fees to be awarded (see Marchese v Marchese, 185AD3d 571, 575). Where both parties will end the case with significant wealth, and the positions of both parties had merit, it may be that both parties will be left to pay their respective counsel fees themselves or that any award of final counsel fees will be relatively modest (see e.g., Barrett v Barrett, 175 AD3d 1067, 1069; Beyel v Beyel, 173 AD3d 1129, 1130-1131; Heymann v Heymann, 102 AD3d 832, 835; Scher v Scher, 91 AD3d at 848). While interim awards are necessary and appropriate in order to enable a party to afford the counsel reasonably necessary to obtain a significant equitable distribution award, an additional, final award [*15]at the end of the case may not be appropriate in light of the equitable distribution result received. In these circumstances, each party bears responsibility for paying for the services each sought from his or her own attorneys without aid from the other. Where each party pays his or her own counsel out of his or her own funds, each party carries the financial responsibility for the selection of counsel and the litigation choices made over the course of the case. However, the equation is quite different where, even though both parties may have significant assets, one party has engaged in dilatory or obstructive conduct which has increased the counsel fee obligations of the other party.
In exercising judicial discretion to determine counsel fee applications, the courts must take into account not only the financial circumstances of the parties but the circumstances of the case as a whole, including the relative merits of the parties' positions and whether either party has delayed the proceedings unreasonably or engaged in unnecessary litigation (see Marchese v Marchese, 185 AD3d at 576; Piccininni v Piccininni, 176 AD3d 880, 881; Jankovic v Jankovic, 170 AD3d 1134, 1135). A less-monied spouse should not be expected to exhaust or spend down a prospective or actual distributive award in order to pay counsel fees as the result of unreasonable or excessive litigation conduct by the adverse party (see Prichep v Prichep, 52 AD3d 61, 66). On the other hand, the more affluent spouse should not be treated as an open-ended checkbook expected to pay for exorbitant legal fees incurred by the less affluent spouse through excessive litigation or the assertion of unreasonable positions. Where a party has asserted unreasonable positions or failed to cooperate in discovery, and thereby increased the cost of the litigation, the court may make a counsel fee award in favor of the offended party or not make, or make a lesser award, in favor of the offending party (see Morille-Hinds v Hinds, 169 AD3d 896, 900; Cravo v Diegel, 163 AD3d 920, 923; Culen v Culen, 157 AD3d at 933; Samimi v Samimi, 134 AD3d 1010, 1013).
An assessment of litigiousness cannot be made simply by looking at which party made the most motions since the need for motion practice may have been prompted by unreasonableness on the part of the non-moving party. Determining whether conduct is reasonable or obstructive on the basis of conflicting affirmations of counsel may often prove to be difficult. An evidentiary hearing may well be of inestimable value in assessing the relative merit of the parties' conduct. That said, the courts are alive to the prospect that a fee hearing is sought solely, or primarily, for the purpose of increasing the costs of litigating the fee issue or to financially injure a party or counsel. Thus, as a matter of discretion, the court may award fees for legal services rendered in fee hearings. An award of fees for the services incurred in seeking fees "is a matter of discretion, to be exercised in appropriate cases, to further the objectives of litigational parity, and to prevent the more affluent spouse from wearing down or financially punishing the opposition by recalcitrance, or by prolonging the litigation" (O'Shea v O'Shea, 93 NY2d 187, 193). These competing considerations should be borne in mind by the court as it conducts the hearing required.
As we have said, the issue of counsel fees in this case needs to be addressed at an evidentiary hearing. We make no finding, and draw no conclusion, as to whether, and to what extent, fees should be awarded. We have set forth some factors to be considered by the Supreme Court upon remand; we do so without any implication as to what the new determination to be made should be and without intending any constraint on the court's provident exercise of its discretionary authority. Thus, notwithstanding the parties' respective positions regarding the appropriate amount of counsel fees to be awarded, the matter must be remitted to the Supreme Court, Westchester County, for a hearing and a determination by the court of the total amount of counsel fees expended in this action and an apportionment of such fees between the parties, taking into account the financial circumstances of the parties, the conduct of the parties throughout the litigation, and any interim payments previously made (see Liberman-Massoni v Massoni, 146 AD3d 869, 869-870; Duval v Duval, 144 AD3d 739, 743; Prichep v Prichep, 52 AD3d at 66). In addition, the plaintiff does not dispute the defendant's contention that the matter must also be remitted for an apportionment of the transcript costs and the fees advanced by the defendant for services provided by a neutral accountant, a jewelry appraiser, and a special master who presided over discovery. We remit the matter for that purpose as well.
We now consider the issue of interim counsel fees. "The purpose of an award of interim counsel fees is to ensure that the less monied spouse will be able to litigate the action on equal footing with the monied spouse" (Duval v Duval, 144 AD3d at 742-743; see O'Shea v O'Shea, 93 NY2d at 193). "'An award of interim counsel fees to the nonmonied spouse will generally be warranted where there is a significant disparity in the financial circumstances of the parties'" (Skokos v Skokos, 168 AD3d 782, 783, quoting Falcone v Falcone, 109 AD3d 787, 788; see Prichep v Prichep, 52 AD3d at 65). "Unlike a final award of counsel fees, a detailed inquiry or evidentiary [*16]hearing is not required prior to the award of interim counsel fees" (Gaffney-Romanello v Romanello, 82 AD3d 930; see Isaacs v Isaacs, 71 AD3d 951; Prichep v Prichep, 52 AD3d at 65).
Taking into account all of the relevant circumstances, including the extensive work done on these appeals and cross appeals, the Supreme Court should have awarded the plaintiff $500,000 in additional counsel fees, rather than the $750,000 awarded and then replaced with the $1.5 million award. "An appropriate award of attorney's fees should take into account the parties' ability to pay, the nature and extent of the services rendered, the complexity of the issues involved, and the reasonableness of the fees under all of the circumstances" (DiBlasi v DiBlasi, 48 AD3d 403, 405 [internal quotation marks omitted]). The court may also consider whether either party has engaged in conduct or taken positions resulting in a delay of the proceedings or unnecessary litigation (see Kugler v Kugler, 174 AD3d 878, 879; Prichep v Prichep, 52 AD3d at 64-65; Ciampa v Ciampa, 47 AD3d 745, 748). Here, the court noted that "this intensely acrimonious matrimonial action involving five years of protracted litigation" has resulted in the billing of more than $5 million in counsel fees, and has caused "increasingly ruinous consequences on [the parties'] family and finances." In considering the parties' ability to pay, the nature and extent of the services rendered, the complexity of the issues involved, and the unnecessarily prolonged litigation caused by the parties' aggressive and acrimonious posture, an award of $500,000 in interim counsel fees is reasonable under all of the circumstances presented herein. However, we note that, in the event that it is subsequently determined, after the hearing directed herein, that the total amount paid by the defendant during the pendency of the action on account of the plaintiff's counsel fees exceeds his appropriate share of that expense, the court may grant the defendant a credit in the amount of the excess against the plaintiff's equitable distribution award (see e.g. Karg v Kern, 125 AD3d 527).
In recognition of the substantial amount of time that has elapsed since the plaintiff made her application for additional interim fees, payment of the interim fee award provided for herein is to be made by the defendant to the attorneys for the plaintiff within thirty (30) days of service of this opinion and order with notice of entry.
VI. Conclusion
The parties' remaining contentions either are academic or without merit.
For the reasons stated, the appeal from the order dated February 29, 2016, is dismissed, and the judgment is modified, on the law, on the facts, and in the exercise of discretion, by (1) deleting the provisions thereof equitably distributing the parties' assets and calculating the defendant's child support obligations, (2) deleting the provision thereof directing that the defendant's maintenance payments to the plaintiff be credited against the plaintiff's equitable distribution award, and (3) deleting the provision thereof awarding the plaintiff $1.5 million in interim counsel fees, and substituting therefor a provision awarding the plaintiff $500,000 in interim counsel fees, to be paid by the defendant to the plaintiff's counsel within thirty (30) days of the service of this opinion and order with notice of entry; as so modified, the judgment is affirmed insofar as appealed and cross-appealed from, the order dated February 29, 2016, is modified accordingly, and the matter is remitted to the Supreme Court, Westchester County, for further proceedings consistent herewith to be conducted expeditiously, and for the entry of an appropriate amended judgment thereafter; pending a new determination on the issue of child support, the parties shall abide by the child support provisions of the so-ordered stipulation dated June 23, 2011.
MALTESE, LASALLE and CHRISTOPHER, JJ., concur.
ORDERED that the appeal from the order dated February 29, 2016, is dismissed, without costs or disbursements; and it is further,
ORDERED that the judgment is modified, on the law, on the facts, and in the exercise of discretion, by (1) deleting the provisions thereof equitably distributing the parties' assets and calculating the defendant's child support obligations, (2) deleting the provision thereof directing that the defendant's maintenance payments to the plaintiff be credited against the plaintiff's equitable distribution award, and (3) deleting the provision thereof awarding the plaintiff $1.5 million in interim counsel fees, and substituting therefor a provision awarding the plaintiff $500,000 in interim counsel fees, to be paid by the defendant to the plaintiff's counsel within thirty (30) days of the service of this opinion and order with notice of entry; as so modified, the judgment is affirmed insofar as appealed and cross-appealed from, without costs or disbursements, the order dated February 29, 2016, is modified accordingly, and the matter is remitted to the Supreme Court, [*17]Westchester County, for further proceedings consistent herewith to be conducted expeditiously, and for the entry of an appropriate amended judgment thereafter; and it is further,
ORDERED that pending a new determination on the issue of child support, the parties shall abide by the child support provisions of the so-ordered stipulation dated June 23, 2011.

2016-02329 ON MOTION
2016-07969
Kim A. Kaufman, respondent-appellant, v Glenn B.
Kaufman, appellant-respondent.
(Index No. 4893/11)

Motion by the appellant-respondent, inter alia, to strike stated portions of the respondent-appellant's supplemental brief on an appeal from an order of the Supreme Court, Westchester County, dated February 29, 2016, and an appeal and cross appeal from a judgment of the same court dated July 21, 2016. By decision and order on motion of this Court dated July 12, 2018, that branch of the motion which is to strike stated portions of the respondent-appellant's supplemental brief was held in abeyance and referred to the panel of Justices hearing the appeals and cross appeal for determination upon the argument or submission thereof.
Upon the papers filed in support of the motion and the papers filed in opposition thereto, and upon the argument of the appeals, it is
ORDERED that the branch of the motion which is to strike stated portions of the respondent-appellant's supplemental brief is granted to the extent that all references in the respondent-appellant's supplemental brief to the supplemental appendix filed by the respondent-appellant other than to pages 9 to 260 of that supplemental appendix are stricken; and it is further,
ORDERED that the motion is otherwise denied.
SCHEINKMAN, P.J., MALTESE, LASALLE and CHRISTOPHER, JJ., concur.
ENTER:
Aprilanne Agostino
Clerk of the Court



Footnotes

Footnote 1: The third decision also dealt with various motions and cross motions, which are not particularly pertinent to the issues presented on appeal.

Footnote 2: The plaintiff's argument that the issue of the 50% award of the cash accounts is not properly before this Court is without merit. The award on account of these assets was reflected in the second decision which thereafter was incorporated by reference in the judgment from which the defendant appeals.

Footnote 3: We note that the parties would have saved themselves time, money, and effort had they agreed upon the "if, as and when" approach before funds were spent on a neutral appraiser and then on partisan critiques of the neutral appraiser.

Footnote 4: The defendant points out that the plaintiff was receiving less than 1% interest in her bank account. Moreover, the Supreme Court noted in its third decision that the plaintiff, in her statement of proposed disposition, presumed that she would receive a 3% return on each $1 million distributed to her. It is therefore perplexing that the court would impose a rate of return that is double what the benefited party perceived she would generate in the market place. We further note that it was inconsistent of the court to first state that a 5% rate was fair and reasonable and then two paragraphs later change the rate to 6% without explanation.